## THOMAS L. BRAYNARD *v.* ELI HOPPOCK.

An essential characteristic of bottomry is, that the money lent is at the risk of the lender during the voyage; and the repayment thereof with interest agreed upon, depends upon the successful termination of such voyage.

Where, by the terms of the contract, the money loaned is to be repayed at all hazards, it is not bottomry; for the principal and extraordinary interest reserved are not absolutely at the risk of the lender by the perils of the voyage.

When, by the terms of the contract, the borrower assigns to the lender, as collateral security for the loan, two policies of insurance upon the vessel, of $2,000 each, and one upon the freight of $4,000, and besides gives him a bill of sale of the vessel, it is not bottomry.

And such a contract of loan, reserving to the lender a greater interest than seven per cent per annum, claiming it as *marine* interest, is usurious and void.

And the money collected by the lender on the collateral securities thus assigned to him in pursuance of such usurious contract, may be recovered by the borrower, in an action properly brought for that purpose.

The facts are sufficiently stated in the opinion of the court.

*J. H. Reynolds*, for the plaintiff, respondent.

*Charles W. Sandford*, for the defendant, appellant.

WRIGHT, J.   The main question in this case is, whether the agreement under which the loan was made to the plaintiff was usurious. If usurious, the judgment is right. The polices on which the defendant received the money from the insurance company were assigned, and the bill of sale of the brig was made and delivered to him in pursuance of such agreement as collateral security for the payment of the loans. In judgment of law, from the time the securities were thus received, they were held wrongfully by the defendant; and there is no pretense that his subsequent collection of the money due upon them was by the consent or even knowledge of the plaintiff.

The agreement was in writing, and in substance this: Hoppock, the defendant, was to advance $1,500 on the brig Sophia, loading in New York, and bound for San Francisco; and the plaintiff, Braynard, agreed to pay him for the use of

.the money, twelve per cent commission, and interest at seven per cent per annum from date (May 16, 1850), until the said amount was paid to said Hoppock in New York. Braynard further agreed to transfer to Hoppock the policy of insurance on the brig, for $8,000; also the policy of insurance on the freight, and the bills of lading of cargo, together with a bill of sale of the vessel. The brig was to be consigned to Mr. Bidleman, in San Francisco, who was to collect her freight, charging the customary commissions at that place for doing the business. He was to remit to Hoppock from the proceeds of the vessels' account, the amount loaned and twelve per cent commission, and interest added until the funds could be placed in Hoppock's hands in New York, holding the balance subject to the order of Braynard. On receipt of the funds in New York, Hoppock was to return to Braynard the policy of insurance on the vessel and bill of sale. In case of the loss of the vessel, the insurance upon her was to be collected by Hoppock, and after paying himself the principal loaned and interest, and twelve per cent commission as agreed, the balance was to be paid to Braynard. In pursuance of this agreement, the loan of May, 1850, was made; and subsequently a further loan of $366, and Braynard assigned to Hoppock two policies of insurance on the vessel for $2,000 each, and a policy on the freight for $4,000, and also executed and delivered to him a bill of sale of the brig.

The transaction, then, was a loan of money with a charge of a premium for a loan largely in excess of legal interest. It was clearly usurious, unless of such a nature as to take it out of the statute. This is conceded; but it is claimed that the contract under which the loan was made, was in substance a bottomry bond upon the brig Sophia. In this I cannot concur. There is but a single expression to the contrary affording the slightest presumption that the parties themselves intended a bottomry, viz.: the advance is stated to be on the brig Sophia, now loading in New York and bound for San Francisco. But whether they so understood it or not, it is plain that that was not the nature or character of the transaction. Bottomry is a contract by which the owner of a

ship hypothecates or binds the ship as security for the repayment of money advanced for the use of the ship. It is defined by Marshall, to be a contract in the nature of a mortgage of a ship, on which the owner borrows money to enable him to fit out the ship, or to purchase a cargo for a voyage proposed, and he pledges the keel or bottom of the ship *pars pro toto*, as a security for the repayment; and it is stipulated if the ship should be lost in the course of the voyage, by any of the perils enumerated in the contract, the lender also shall lose his money; but if the ship should arrive in safety, then he shall receive back his principal and also the interest agreed upon, generally called *marine interest.* (2 Marshall on Insurance, 733.) An essential character of bottomry is, that the money lent is at the risk of the lender during the voyage, and that the repayment thereof depends on the event of the successful termination of the voyage. It is the very essence of the contract that the lender runs the risk of the voyage, and that both principal and interest be at hazard. If the vessel is lost at the time the money becomes payable, the lender cannot recover either principal or interest, and where her arrival in safety entitles him to repayment, he is confined to the security of the ship, and cannot enforce his claim personally against the owner beyond the value of the pledged fund which may come into his hands. It is no bottomry where the money is payable at all events, for the principal and extraordinary interest reserved is not put absolutely at hazard by the perils of the voyage. The lender must run the maritime risk to earn the maritime interest. If, by the terms of the contract, the owner binds himself personally to repay the loan, or there be collateral security for its absolute repayment, it is not a bottomry loan. Repayment does not depend upon the contingency of the safe arrival of the ship, but whether lost or not it is to be made, and there is no risk taken. Judge PETERS, in *Fisher* v. *Conynham* (2 Pet. Ad. Rep., 295), in enumerating what is essential to constitute a valid bottomry, says: "the sum loaned must be at a risk, and there must not be a personal responsibility, that is, the money must be advanced on the faith of the ship, and at the sole

risk of her loss or safety. It cannot be given as a double security, running along with a personal responsibility, the one excludes the other ; the risk being solely confined to the ship, is the only justification allowed by the law of all commercial countries for the maritime interest.

Now look at this case in the light of these peculiar characteristics of a bottomry transaction. It seems to me there is no ground for considering the agreement a contract in the nature of bottomry, or the loan one on bottomry. The lender took no maritime risk. The principal and interest were never at hazard from any sea risk. The defendant's reimbursement of principal and interest was not dependent upon the hazard of any voyage, or the safe arrival of any vessel at any port. By the terms of the contract, lawful interest in addition to the commission specified was to be paid absolutely, and not upon any contingency, until the principal, interest and commission should be paid to the defendant in the city of New York. In addition to the individual liability of the borrower, and by the terms of the agreement, he assigned to the lender as collateral security for the loan, two policies of insurance on the brig, each for the sum of $2,000, and a policy of insurance on the freight for $4,000, and also gave him a bill of sale of the vessel. It is impossible to say this was a contract for a loan on bottomry, entitling the lender to marine interest. The lender took no risk whatever, and intended to take none.

I think the judgment should be affirmed.

Campbell, J., dissenting. In May, 1850, the parties entered into a contract in writing in the city of New York, by which it appears that Hoppock was to advance to Braynard the sum of $1,500, on the brig Sophia, then loading in New York and bound for San Francisco. In consideration thereof, Braynard agreed to pay Hoppock twelve per cent commission, and interest at seven per cent per annum. Braynard was to give Hoppock a bill of sale of the brig for $1,500, and to transfer to him a policy of insurance on the vessel, together with a policy of insurance on the freight and the bill of lading of

the cargo. The vessel was to be consigned to one J. B. Bidleman, to San Francisco, who was to do the vessel's business and charge his commissions, and to remit to Hoppock, at New York, from the net proceeds of vessel's account, the above amount of fifteen hundred dollars, and twelve per cent commission and interest, and interest added until the funds can be placed in said Hoppock's hands in New York. The balance was to be paid to Braynard, and in case of receipt by Hoppock of the foregoing amount, the policy of insurance and bill of sale to be returned to Braynard, and in case of loss, the insurances to be collected by Hoppock, and after payment of his claim, the balance to be paid to Braynard. Some months afterward, Hoppock ordered the further sum of three hundred dollars substantially on the same terms, except the commission was fifteen per cent.

The brig sailed from New York and arrived at San Francisco in March, 1851, in a damaged condition, and subject to claims and demands amounting to from $8,000 to $10,000, including a bottomry bond given at Valparaiso, and seamen's wages. Nothing was realized by the parties from the vessel, and Bidleman received only between two and three hundred dollars on account of the cargo. The bottomry bond was for over $7,000, and the vessel was finally sold at auction for $600. In November, 1851, Hoppock collected from the insurance companies about $1,000 on account of policies on the vessel, and $133 on freight policy, and these two amounts were all that were received by him.

Shortly thereafter this action was commenced by Braynard to recover from Hoppock these sums of money, on the ground that the original transaction was usurious, and it was so held in the Superior Court of New York, and a judgment rendered in favor of Braynard for the amount so received by Hoppock. On the trial, it appeared that the commissions in New York, on advances on vessel, freight or cargo, from New York to San Francisco, was from twelve to fifty per cent, and that twelve per cent was very low. The defendant, Hoppock, appeals to this court.

The true definition of a bottomry bond, in the sense

of the general maritime law, says Mr. Justice STORY, "is a contract for a loan of money on the bottom of the ship, at an extraordinary interest upon maritime risks, to be borne by the lender for the voyage, or for a definite period." This contract may be entered into by the master in a foreign port, *virtute officii* when the necessities of the ship require it, or it may be entered into by the owner as the *dominus navis*, who may employ the money as he pleases. The security may be in the shape of a bond, or it may be given by a transfer of the title. The hypothecation of the vessel, and the transfer of the right to collect the freight, in this case, was a maritime contract, and not within the statute of usury, as Hoppock was only to receive his money back from the net proceeds of the vessel's account, I mean, of course, without reference to the question of insurance. If Hoppock had advanced the fifteen hundred dollars, and taken as security the vessel and the freight to be earned on her then contemplated voyage, I suppose there is no doubt but he might have taken out a valid insurance policy to protect himself to the extent of his advance, that is, as far as a policy would be a protection. Then if, at the time of the advance, the owner of the vessel has obtained policies of insurance on the vessel and freight, and says, in addition to the hypothecations of the vessel, I will also transfer to you, as further security, those policies, does such transfer necessarily make the transaction usurious? The judge who tried the cause, found, as matter of law, that the transactions were usurious. If we look into the evidence, it will be seen that the rate of commissions paid in New York on advances, on the security of vessel and freight on voyages from New York to San Francisco, was from twelve to fifty per cent. Twelve per cent was the lowest, and may have been taken, in this case, in consequence of the further security afforded by the transfer of the policies. No note, bond or other personal obligation was given by Braynard, the owner of the vessel. All that could be said as to the policies is, that they were further and additional securities to the hypothecation of the vessel. There was no positive liability on the part of

Braynard himself, or of any insurance company, to return the money in any event. Apart from the fact that many an insurance company has failed to pay its losses, there are perils attending the vessel which goes out on the great deep, which no ordinary marine policy protects against. In this very case there was a lien created at Valparaiso by way of bottomry bond, and that, together with seamen's wages, amounted to probably as much or more than the vessel was worth when she arrived at San Francisco. As bottomry securities, differing from other liens, are paid in the inverse order of their creation, the last first, the bottomry lien of Hoppock was virtually gone when the vessel reached her port of destination. He was then thrown back on his policies, from which he seems to have realized a considerable portion of his advance.

Looking at this whole contract simply as it was written out, it seems to me that the hypothecation of the vessel, and the transfer of the policies, all having reference to the one vessel and one voyage, was together but one single maritime transaction, and was not in and of itself usurious. There was, I think, a complete maritime risk, and maritime interest might be taken. Where bottomry bonds are given by the master in a foreign port, and, at the same time, bills of exchange are drawn on the owners for the amount, the validity of the bond is not affected when it is made to appear that the lender relied on it mainly for his security. (3 Mason, 341; Ware, 249.) In such a case, the bills of exchange would be a further and additional security, whether available or not, depending on the willingness of the owner to accept, and his ability to pay.

It has often been said, both in England and this country, that these maritime contracts ought to be treated with great favor by the courts. The obtaining money on bottomry bonds, especially in foreign ports, by the master, is often absolutely necessary, in order that the vessel may be repaired and proceed on her voyage. And at home, the owner may often be obliged to pledge his ship, in order to fit her out for sea, and put her in a condition to become available.

If this contract is not usurious on its face, as I think clearly it is not, then there may still be a question of fact, whether it was a mere pretense or arrangement to avoid the statute against usury, or whether it was a fair maritime transaction, and so considered by the parties at the time. From the evidence showing the rates of commission on such advances, it appears to have been what might be a common and entirely fair transaction. But, at all events, if there was any doubt, the fact ought to be fairly tried and found by the judge or by a jury. For this reason, I think the judgment should be reversed, and a new trial awarded.

Judgment affirmed.